October 11, 1996 United States Court of Appeals
For the First Circuit


No. 95-2107
ROMA CONSTRUCTION COMPANY AND PETER ZANNI,
Plaintiffs, Appellants,

v.

RALPH A. ARUSSO, ET AL.,
Defendants, Appellees.



ERRATA SHEET ERRATA SHEET

The concurring opinion by Judge Lynch in the above-captioned
case, issued on September 27, 1996, is corrected as follows:

On page 36, line 3: insert "in" before "stating"

On page 36, footnote 16: change "footnote 7 supra" to "footnote 14 
supra" 

On page 38, line 6: insert "that" after "likely"

On page 40, line 9: change "operate" to "have operated"

On page 42, line 8: change "supra footnote 10" to "supra footnote 17" 

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-2107

ROMA CONSTRUCTION COMPANY
AND PETER ZANNI,

Plaintiffs - Appellants,

v.

RALPH R. ARUSSO, ET AL.,

Defendants - Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Francis J. Boyle, Senior U.S. District Judge] 



Before

Torruella, Chief Judge, 

Cyr and Lynch, Circuit Judges. 



G. Robert Blakey, with whom Ina P. Schiff, Henry F. Spaloss 
and Spaloss & Rosson were on brief for appellants. 
Kathleen M. Powers, with whom Marc DeSisto and DeSisto Law 
Offices were on brief for appellee Town of Johnston. Samuel D. 
Zurier, with whom Julius C. Michaelson and Michaelson & Michaelson 
were on brief for appellees aRusso, et al. 



September 27, 1996


TORRUELLA, Chief Judge. Plaintiffs-Appellants Roma TORRUELLA, Chief Judge. 

Construction Co, Inc. ("Roma") and Peter Zanni ("Peter Zanni")

(collectively, "the plaintiffs"), challenge the district court's

dismissal of their claims against Defendants-Appellees Mayor

Ralph R. aRusso ("aRusso"), Councilman Benjamin Zanni ("Benjamin

Zanni"), Domenic DeConte, Vincent Iannazi, Anthony Izzo, et al. 

(collectively, "the individual defendants"), and the Town of

Johnston, Rhode Island ("the Town") (together with the individual

defendants, "the defendants"). Specifically, the district court

granted judgment on the pleadings regarding: (1) Roma's

racketeering claims against the individual defendants and the

Town under the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. 1964(a), and R.I. Gen. Laws 7-15-1 et 

seq. ("state RICO"); and (2) Roma's civil rights claims against 

the individual defendants and the Town under 42 U.S.C. 1983.

Roma also challenges the district court's decision to deny the

pro hac vice admission of attorney G. Robert Blakey ("Blakey"). 

For the following reasons, we reverse the dismissal of the RICO,

state RICO and civil rights claims, reverse the district court's

decision not to admit Blakey, and we remand for further

proceedings in accordance with this opinion.

I. BACKGROUND I. BACKGROUND

We review dismissals pursuant to Fed. R. Civ. P.

12(b)(6) under the rubric that all reasonable inferences from

properly pleaded facts are to be drawn in the plaintiffs' favor.

P rez-Ruiz v. Crespo-Guill n, 25 F.3d 40, 42 (1st Cir. 1994); 

-2-

Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 

1989).

Drawing all reasonable inferences for the plaintiffs,

the tale proceeds as follows. The plaintiffs Peter Zanni and

Roma entered into a real estate development venture with Harry

and Russell DePetrillo ("the DePetrillos"). Unknown to the

plaintiffs, the DePetrillos had entered into an arrangement with

the alleged de facto government of the Town, with aRusso as "the

Boss," under which payments would be made to this enterprise in

order to obtain necessary approvals. After the DePetrillos sold

their share, Peter Zanni was informed of this preexisting deal,

and was warned that his project was "dead" if he did not make

payments. Having invested heavily in the project, and reasonably

believing that he was dealing with a racketeering enterprise that

had extorted and stolen for years during its control of the Town,

Peter Zanni paid up. He continued paying for three years, until

he was able to sell his share of the development. He then

informed the FBI, and cooperated with its investigation and later

with prosecutions of official corruption in the Town.

Peter Zanni and Roma brought federal and state civil

racketeering claims and federal civil rights claims, charging

that they were injured by the conduct of aRusso and his fellow

individual defendants, as well as the Town. The district court

dismissed these charges on the grounds that the plaintiffs' own

conduct rendered them unable to maintain standing to press their

claims. The plaintiffs appeal the dismissals of their

-3-

racketeering1 and civil rights claims, as well as the district

court's decision to deny the pro hac vice admission of their 

desired counsel, G. Robert Blakey ("Blakey").

II. DISCUSSION II. DISCUSSION

We address first the plaintiffs' challenge to the

dismissals of their causes of action, and then confront their

appeal of the district court's decision to deny admission to

Blakey.

A. Causes of Action A. Causes of Action

After setting forth the applicable standard of review,

we turn first to the plaintiffs' challenge to the district

court's dismissal of their racketeering claims. We then shift to

the issue of the plaintiffs' section 1983 claims.

1. Standard of Review 1. Standard of Review

Upon considering a motion to dismiss for failure to

state a claim under Fed. R. Civ. P. 12(b)(6), the district court

should not grant the motion unless it appears to a certainty that

the plaintiff would be unable to recover under any set of facts.

Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 

(1976); Gonz lez-Bernal v. United States, 907 F.2d 246, 248 (1st 

Cir. 1990). We review under the same standard, Holt Civic Club 

v. City of Tuscaloosa, 439 U.S. 60, 66 (1978). 

 

1 At oral argument, the plaintiffs stated that, on appeal, they
did not wish to challenge the district court's dismissal of their
racketeering claims against the Town. Plaintiffs also stipulated
that they would not attempt to assert such claims against the
Town in the future. Accordingly, vis-a-vis the Town, the only
damage claims we address are those pursuant to section 1983.

-4-

2. The Racketeering Claims 2. The Racketeering Claims

RICO creates a civil remedy for "[a]ny person injured

in his business or property by reason of a violation of section

1962 of this chapter." 18 U.S.C. 1964(c). Subsection (c) of

section 1962, in turn, declares that it is unlawful "for any

person employed by or associated with any enterprise engaged in,

or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in

the conduct of such enterprise's affairs through a pattern of

racketeering activity or collection of unlawful debt." Id.  

1962(c). An "enterprise" is defined to include "any individual,

partnership, corporation, association or other legal entity, and

any union or group of individuals associated in fact although not

a legal entity." Id. 1961(4). "Racketeering activity" includes 

any one of a number of enumerated criminal acts indictable under

federal or state law. See id. 1961(1). A "'pattern of 

racketeering activity' requires at least two acts of racketeering

activity . . . the last of which occurred within ten years . . .

after the commission of a prior act of racketeering activity."

Id. 1961(5). 

The district court dismissed the plaintiffs' civil RICO

claims on the ground that, by their own pleadings, plaintiffs

were not innocent victims and therefore could not maintain civil

RICO standing. The district court found support for the

proposition that only innocent victims could collect damages via

civil RICO in the legislative history of the provision. See 

-5-

Organized Crime Control: Hearings on S. 30 Before the Subcomm. 

No. 5 of the House Committee on the Judiciary, 91st Cong., 2d. 

Sess. (1970) (stating, in the Act's "Findings and Purpose," that

"Congress finds that . . . organized crime activity in the United

States harms innocent investors and competing organizations");

116 Cong. Rec. H35,346-47 (Oct. 7, 1970) (statement of Rep.

Steiger, the private civil remedy provision's sponsor) ("It is

the intent of this body, I am certain, to see that innocent

parties who are the victims of organized crime have a right to

obtain proper redress."). The district court's reasoning can be

better delineated in conjunction with a recitation of plaintiffs'

claims. Drawing inferences in favor of the plaintiffs, their

pleadings suggest the following situation. The plaintiffs joined

the DePetrillos in a real estate venture, unaware that the

DePetrillos had entered into a scheme in which regulatory

approvals had already been granted in exchange for the

DePetrillos' payment of $10,000 to aRusso and his purported

associates. The plaintiffs were similarly unaware that the

DePetrillos had agreed to pay an additional $40,000. Several

years later, defendant Councilman Benjamin Zanni approached them

for the purported "balance due." As the district court

emphasized, the plaintiffs then faced a dilemma. They could

refuse to pay, jeopardizing their $2 million investment in the

project, and as the district court suggested was their

obligation, go immediately to the authorities. Or, they could

submit to this extortion to protect their investment. They chose

-6-

the latter route. The plaintiffs state that they complied with

all rules and regulations, and did not seek preferential

treatment, but paid to avoid threatened adverse consequences.

Specifically, the plaintiffs point to Benjamin Zanni's alleged

statement to Plaintiff Peter Zanni that the venture was "dead"

unless the balance was paid. Three years later, after they sold

their partnership interests in the venture, the plaintiffs

contacted the FBI, and assisted agents in a sting operation.

Looking at these contentions, one reasonable conclusion

is that the plaintiffs made these payments without any intent or

desire to subvert governmental processes, but felt compelled to

pay to protect their substantial investment in the venture, and

did not contact the FBI until they had mitigated risks to their

investment. However, the district court concluded that, even

under this favorable view of the plaintiffs' conduct they could

not be considered innocent parties, and so could not, according

to the district court's interpretation of RICO standing, maintain

a civil RICO claim. The district court concluded that, since the

plaintiffs' own pleadings indicate that they paid $40,000 to the

individual defendants to assure timely processing of permits and

approvals necessary for their project, the plaintiffs were

"neither innocent nor victims." Roma Constr. Co. v. aRusso, 906 

F. Supp. 78, 82 (D.R.I. 1995).

The plaintiffs challenge the district court's dismissal

of their civil RICO claims on the pleadings. Plaintiffs dispute

that there is any "innocent party" requirement under RICO. In

-7-

the alternative, the plaintiffs contend that, even assuming such

an "innocent party" requirement, the district court erred as a

matter of law in concluding, that even taking the most favorable

view of the plaintiffs' pleadings, they were necessarily not

"innocent parties." Although the district court spoke of the

"innocent party" requirement as one of "standing," it appears to

have also considered its "innocent party" requirement as being in

the nature of an affirmative defense which could be determined at

the pleadings stage. The district court analogized to antitrust

cases under the Clayton Act in which an "equal involvement"

defense is recognized. See Bateman Eichler, Hill Richards Inc. 

v. Berner, 472 U.S. 299, 310-11 (1985); Perma Life Mufflers v. 

International Parts Corp., 392 U.S. 134 (1968). Whether or not 

there exists such an "innocent party" requirement is a question

of first impression in this circuit and, indeed, we are not aware

of any cases anywhere that adopt such a requirement. We need

not, however, decide whether or to what extent RICO imposes an

"innocent party" limitation, or whether any such requirement

might take the form of a standing requirement or an affirmative

defense, because we conclude that the district court erred in

finding that plaintiffs could prove no set of facts which would

show their nonculpability under all potentially applicable

criminal statutes.2
 

2 In deciding not to address the broader issues discussed in the
concurring opinion, we need not necessarily quarrel with our
respected colleague's analysis. Concededly, dismissal of the
complaint based on appellees' assertion of a fact-intensive
"equal involvement" defense would be inappropriate on the

-8-

Our analysis commences with an examination of the

standards under which the district court evaluated plaintiffs'

behavior. In deciding that such payments, even if coerced,

forced it to conclude that the plaintiffs were not innocent

victims, the district court cited two authorities. See Roma 

Constr. Co., 906 F. Supp. at 81-82 (citing R.I. Gen. Laws 11-7- 

4 (1994) and Model Penal Code 240.1 commentary at 41 (1980)).

Initially, the district court noted that Rhode Island General Law

11-7-4 states that

[n]o person shall corruptly give . . .
any gift or valuable consideration to . .
. any public official as an inducement or
reward for doing or forebearing to do
. . . any act in relation to the business
of . . . the state, city or town of which
he or she is an official.

R.I. Gen. Laws 11-7-4 (1994). The statutory language does not

address the question of whether one who pays due to coercion is

an innocent victim. The district court did not refer to, and we

fail to find, any Rhode Island authority for direction on this

point.

Rather, the district court drew on the commentary to

 

undeveloped record presently before the court. The concurring
opinion hypothesizes that the substance of any such defense would
be informed by preexisting federal statutes embodying comparable
defenses. By contrast, the district court's dismissal depends
entirely on the existence, vel non, of either an absolute 
innocent-victim "standing" requirement or a law-based in pari 
delicto defense, each of which, by its very nature, is more 
readily susceptible to summary disposition than a fact-intensive
"equal involvement" defense. Thus we caution that nothing we
have said is meant to suggest that Congress intended to create
either such a "standing" requirement or an in pari delicto 
defense.

-9-

the Model Penal Code's definition of bribery to conclude that the

plaintiffs' payments, even if construed to be the product of

coercion, constituted illegal bribery. See Roma Constr. Co., 906 

F. Supp. at 81. The cited commentary to section 240.1 of the

Model Penal Code states that 

[a] private citizen who responds to an
official's threat of adverse action by
paying money to secure more favorable
treatment evidences thereby a willingness
to subvert the legitimate processes of
government . . . . Such conduct
constitutes a degree of cooperation in
the undermining of governmental integrity
that is inconsistent with the complete
exoneration from criminal liability.

Model Penal Code 240.1 commentary at 41 (1980). The district

court thus concluded that since even the interpretation of the

pleadings that most favors the plaintiffs requires a

determination that plaintiffs capitulated to official threats of

adverse action, they were not "innocent parties." Taken together

with its reading of the legislative history that RICO was

intended to protect "innocent parties" and with its assessment of

public policy in the form of "economic incentives," the district

court proceeded to dismiss the plaintiffs' claims on the

pleadings. Roma Constr. Co., 906 F. Supp. at 83. 

The district court thus ultimately relied on the policy

concerns it understood to be addressed in the Model Penal Code.

Assuming for the sake of argument that lack of "innocence" is an

issue in a civil RICO claim, the question must be addressed

whether the district court considered the correct sources for the

definition of "innocence." We believe that where racketeering

-10-

statutes provide for a civil remedy, at the very least we should

deny RICO remedies only with reference to statutes or case law,

not on policy grounds. See generally Sedima, S.P.R.L. v. Imrex 

Co., 473 U.S. 479, 498-500 (1985) (rejecting, due to RICO 

statutory language and legislative history that counsel a broad

interpretation, a court of appeals-imposed RICO standing

limitation as inappropriate judicial "statutory amendment" even

though the Court shared the lower court's concerns about

"extraordinary" uses of RICO). As a result, we turn to the

question of whether the issue presented is properly one of

federal common law for which the Model Penal Code might prove a

legitimate source of uniform legal principles, or one to which we

would apply Rhode Island law.

The Supreme Court has recognized that federal courts

have the power to formulate federal common law when a federal

rule of decision is necessary to protect "uniquely federal

interests" or when Congress has given the courts the power to

develop substantive law. Texas Indus. v. Radcliff Materials, 

Inc., 451 U.S. 630, 640 (citing Banco Nacional de Cuba v. 

Sabbatino, 376 U.S. 398, 426 (1964) and Wheeldin v. Wheeler, 373 

U.S. 647, 652 (1963)). Areas of "uniquely federal interests"

include areas such as "the rights and obligations of the United

States, interstate and international disputes implicating the

conflicting rights of States or our relations with foreign

nations, and admiralty cases." Id. at 641. Several courts have 

concluded that RICO does not implicate "uniquely federal

-11-

interests," since "[r]egulation of organized crime does not fall

within the above categories and, although RICO is federal

legislation, individual states also take active roles in fighting

organized crime and providing redress for its injured citizens."

Friedman v. Hartmann, 787 F. Supp. 411, 417 (S.D.N.Y. 1992); 

Minpeco v. Conticommodity Servs. Inc., 677 F. Supp. 151, 155 

(S.D.N.Y. 1988) ("RICO, although reflecting Congress' intent in

providing creative federal responses to the problems of organized

crime, does not address a uniquely federal interest."); Seminole 

Electric v. Tanner, 635 F. Supp. 582, 584 (M.D. Fla. 1986). We 

agree that RICO does not concern uniquely federal interests.

As a result, we inquire whether the question presented

-- is RICO standing limited to "innocent" parties? -- falls

within an area in which Congress has given the courts the power

to develop substantive law. Texas Industries, 451 U.S. at 640. 

The district court, in effect, decided that the issue of federal

civil RICO standing and its relationship to a party's innocence

was properly decided as a matter of uniform federal common law. 

The district court looked to uniform model codes and emergent

trends as guides for fashioning a federal common law rule which

would foster what it perceived as important federal interests

underlying civil RICO. The district court suggested that the

Congress that enacted RICO in 1970, which referred obliquely in

legislative history to the purpose of aiding "innocent parties,"

would be cognizant of the emerging Model Penal Code trend in the

law of bribery, presupposing that Congress gave courts the power

-12-

to develop substantive law regarding this issue.

We find no evidence of any congressional intent that

the "innocence" of a RICO "victim" should be made to turn on a

uniform federal common law rule. Neither party cites, and we

have been unable to find, statutory provisions or legislative

history evidencing such a grant of authority. While there has

been a great deal of commentary regarding the appropriate scope

of federal common law, see, e.g., Morgan v. South Bend Community 

Sch. Corp., 797 F.2d 471, 475 (7th Cir. 1986) (collecting 

commentary), it is not disputed that "when the federal government

is not a party to the litigation" -- as is the case here --

"neutral state rules that do not undermine federal interests

should be applied unless some statute (or the Constitution)

authorizes the federal court[s] to create a rule of federal law,"

id. at 475 (citing Miree v. DeKalb County, 433 U.S. 25, 28-33 

(1977)). More specifically, the Supreme Court has rejected a

judicially created restriction on RICO standing, despite voicing

agreement with the policy concerns that drove the limitation in

question. See Sedima, 473 U.S. at 498-500. As a result, 

assuming -- without concluding, as we ultimately find the

plaintiffs to be innocent parties -- that RICO standing is

limited to "innocent parties," we believe that the question of a

party's innocence must be resolved via the incorporation of state

law into the federal law of RICO standing in order to answer the

instant question. We recognize that the incorporation of state

law into federal law implicates a serious problem of uniformity

-13-

of federal law throughout the states. However, since RICO does

not implicate uniquely federal interests and since there is a

lack of support for the view that Congress authorized the federal

courts to generate federal common law in this area, the

incorporation of state law is the preferable alternative. See, 

e.g., In re Sunrise Sec. Litig., 916 F.2d 874, 881 (3d Cir. 1990) 

(finding it appropriate "to look to state law for guidance in

deciding whether plaintiffs have stated a nonderivative

[shareholders'] claim, [enabling them to maintain standing,]

rather than to fashion federal common law"); Leach v. Federal 

Deposit Ins. Corp., 860 F.2d 1266, 1274 (5th Cir. 1988) 

(concluding that "the incorporation of state law to determine

whether a shareholder has been injured under RICO is preferable

to generating federal common law" despite the possibility of "a

serious problem of uniformity of federal law throughout the

states"); cf. In re Bieter Co., 16 F.3d 929, 935 (8th Cir. 1994) 

(applying federal common law of attorney-client privilege to a

civil RICO action, where such application is authorized by

Supreme Court Standard 503 and Supreme Court case law).

As a result, in assessing plaintiffs' innocence, we

must apply Rhode Island bribery law. The district court

concluded that the pleadings rendered the plaintiffs "not

innocent" vis-a-vis charges of bribery. See Roma Constr. Co., 

906 F. Supp. at 83 (stating that to allow the plaintiffs standing

might result in a rule under which "[p]ersons, such as the

plaintiffs, could engage in bribery of public officials with full

-14-

knowledge that if the bribery scheme . . . broke down, they could

seek a treble return on their illicit, but failed investment").

Turning to Rhode Island law, however, this conclusion cannot be

reconciled with Rhode Island's bribery statute. The district

court relied on the Model Penal Code's bribery provision, which

states that 

[a] person is guilty of bribery, a felony of
the third degree, if he offers, confers, or
agrees to confer upon another, or solicits,
accepts or agrees to accept from another:

(1) any pecuniary benefit as
consideration for the recipient's
decision, opinion, recommendation, vote
or other exercise of discretion as a
public servant, party official, or voter;
or

(2) any benefit as consideration for the
recipient's decision, vote,
recommendation or other exercise of
official discretion in a judicial or
administrative proceeding; or

(3) any benefit as consideration for a
violation of a known legal duty as a
public servant or party official. 

Model Penal Code 240.1 ("Bribery in Official and Political

Matters"). While the district court may have rightly concluded

that the plaintiffs are not innocent of bribery under the Model

Penal Code, we do not think that this fact counsels for the same

conclusion under Rhode Island law, since the Code's own

commentaries expressly recognize that the Code does not follow

Rhode Island law. Part II Model Penal Code and Commentaries 6,

n.2 (1980). Moreover, unlike Rhode Island's statute, the Model

Penal Code provision contains no requirement that a payor act

-15-

"corruptly." Compare R.I. Gen. Laws 11-7-4 ("[n]o person shall 

corruptly give") (emphasis added) with Model Penal Code 240.1 

("[a] person is guilty of bribery . . . if he offers, confers, or

agrees to confer upon another").3 

The plaintiffs argue that the Model Penal Code's

omission of the term "corruptly" is no mere semantic distinction;

rather, it represents a shift from the common law in expanding

the scope of bribery sanctions for payors to situations in which

the payor does not act corruptly. See generally James Lindgren, 

The Elusive Distinction Between Bribery and Extortion: From the 

Common Law to the Hobbs Act, 35 U.C.L.A. L. Rev. 815, 824 n.41 

(1988). We agree. "[A] statutory term is generally presumed to

have its common-law meaning." Evans v. United States, 504 U.S. 

255, 259 (1992); United States v. Aguilar, U.S. , , 115 

S. Ct. 2357, 2370 (1995) (Scalia, J., dissenting) (stating that

 

3 The federal bribery and gratuity statute, 18 U.S.C. 201,
does not, by its terms, apply to local officials such as those
involved in the instant case, 18 U.S.C. 201(a)(1), although
cases have held the statute applicable where local officials
administer federally funded programs. See United States v. 
Vel zquez, 847 F.2d 140, 142 (4th Cir. 1988) (concluding deputy 
sheriff was a "public official" with respect to federal bribery
statute, where county jail was under contract with federal
government to supervise federal prisoners); United States v. 
Gallegos, 510 F. Supp. 1112, 1114 (D.N.M. 1981) (ruling state 
government employee who worked under direct supervision of
federal official in administration of federal grant program was
"public official" for purpose of federal bribery statute). But 
see United States v. Del Toro, 513 F.2d 656, 662 (2d Cir.) 
(concluding city administrator who was city employee was not a
public official even though he administered model cities program,
for which the federal government provided 100% funding), cert. 
denied, 423 U.S. 826 (1975). No allegation has been made that 
the defendants' bribery/extortion scheme was in connection with a
federal contract or federal funding.

-16-

"the term 'corruptly' in criminal laws has a long-standing and

well-accepted meaning"). The term "corruptly" adds the element

of corrupt intent to the crime of bribery. See generally id. at 

2370 (endorsing the proposition that "[a]n act is done corruptly

if it's done voluntarily and intentionally to bring about either

an unlawful result or a lawful result by some unlawful method,

with a hope or expectation of either financial gain or other

benefit to oneself or a benefit of another person"); H.R. 748,

87th Cong., 1st Sess. 18 (1961) (reporting section 201 federal

bribery statute) (stating that "[t]he word 'corruptly' which is

also used in obstruction of justice statutes (18 U.S.C. 1503-

1505) means with wrongful or dishonest intent").

We agree that the term "corruptly" indicates a specific

corrupt intent that differs from the Model Penal Code

commentary's condemnation of an involuntary payor's conduct as

manifesting "a degree of cooperation in the undermining of

governmental integrity that is inconsistent with the complete

exoneration from criminal liability." Model Penal Code 240.1

commentary at 41. The mens rea implicated by "corruptly" 

concerns the intention to obtain ill-gotten gain; by contrast,

the Model Penal Code converts the lack of willpower to stand up

to abusive authority into a degree of culpability. See Lindgren, 

supra at 824 n.41 (stating that "[t]he Model Penal Code has taken 

the questionable approach of making it bribery to capitulate to

an extortion threat"). Admittedly, to delve into questions of

what is done "corruptly" is more difficult than to apply the

-17-

Model Penal Code's standard. But as one commentator has noted,

"[t]he best that can be said for the [Model Penal Code's bribery]

provision is that it makes difficult questions of crime

definition easy, but this clarity is bought at the cost of

ignoring the settled law of centuries and current notions of

right and wrong." Id. 

As a result, we must apply the common law standard of

specific corrupt intent, as included in the Rhode Island statute,

to the plaintiffs' story. The plaintiffs claim that they paid

only to avoid adverse consequences, that their properties met the

standards required for the approvals in question, and that they

received nothing beyond fair treatment from payees. Examining

these claims with an eye towards detecting corrupt intent, we

think that a set of facts could be found from which it could be

reasonably inferred that the plaintiffs did not make payments

voluntarily to bring about an unlawful result, with the hope of a

gain for themselves, but rather that they were the innocent

victims of a criminal enterprise. As a result, we conclude that

Rhode Island's bribery statute does not foreclose a conclusion

that they are "innocent parties."

Citing United States v. Mariano, 983 F.2d 1150 (1st 

Cir. 1993) and United States v. Hathaway, 534 F.2d 386 (1st Cir. 

1976), the defendants assert that we have previously held that

"bribery and extortion are not mutually exclusive concepts,"

Mariano, 983 F.2d at 1159; Hathaway, 534 F.2d at 395. However, 

we think these cases unavailing for three reasons. First,

-18-

neither deals with Rhode Island's bribery statute. Second, even

if these cases compelled us to conclude that bribery and coercive

extortion are not mutually exclusive concepts under the Rhodes

Island statute, in the instant case a genuine issue of material

fact remains as to the plaintiffs' intent in making payments,

based on a reading of the pleadings in the best light for the

plaintiffs.

Third, and finally, Mariano, at least, involved two 

defendants who pled guilty to "corruptly giv[ing] . . .

[some]thing of value" to local government officials "with intent

to influence or reward" those officials, where the officials were

part of a governmental unit that received substantial federal

subsidies, in violation of 18 U.S.C. 666(a)(2). Mariano, 983 

F.2d at 1153. On appeal, both defendants challenged the district

court's application of the sentencing guideline relating to

bribery rather than the guideline appropriate to providing an

illegal gratuity. Id. at 1159. They argued that "they were 

victims, not perpetrators, of an extortionate scheme, and that

they received nothing extra in return." Id. Applying the 

clearly erroneous standard of review, we concluded that the

"guideline analogy chosen by the district court was well within

its purview," noting that "when there are two plausible views of

the record, the sentencing court's adoption of one such view

cannot be clearly erroneous." Id. at 1160; see United States v. 

St. Cyr, 977 F.2d 698, 706 (1st Cir. 1992). In particular, we 

noted that the Mariano defendants could not "expect the courts to 

-19-

swallow their tale uncritically." Mariano, 983 F.2d at 1160. 

In this case, the district court improperly dismissed

the plaintiffs' case before it had a chance to swallow, let alone

digest, their story. At this stage of the game, since one

plausible view is that the plaintiffs were in fact victims of

coercive extortion, and since they have not pled guilty to a

crime that involves "corrupt intent" as an element as we noted of

the defendants in Mariano, 983 F.2d at 1159, we conclude that the 

plaintiffs in the instant case may press on with their claim. As

a result, we reverse the district court's dismissal of the

plaintiffs' federal RICO claims. Accordingly, we also reverse

the district court's dismissal for lack of supplemental

jurisdiction, see 28 U.S.C. 1367, of state RICO claims pursuant 

to R.I. Gen. Laws 7-15-2, 7-15-3 and 9-1-2.4 We remand both

federal and state RICO claims for further proceedings in

accordance with this opinion. 
 

4 Similar to federal RICO, R.I. Gen. Laws 7-15-2(c) provides
that

[i]t shall be unlawful for any person
employed by or associated with any
enterprise to conduct or participate in
the conduct of the affairs of the
enterprise through racketeering activity
or collection of an unlawful debt.

Rhode Island law also uses broad standing language that resembles
that of 18 U.S.C. 1964(c) in its provision for civil liability
for racketeering offenses. See R.I. Gen. Laws 9-1-2 (stating 
that "[w]henever any person shall suffer any injury . . . by 
reason of the commission of any crime or offense . . . he [or
she] may recover his [or her] damages for such injury in a civil
action against the offender") (emphasis added).

-20-

Because we conclude that even if RICO's civil remedies

were limited to innocent parties, we would apply Rhode Island law

to the question of the plaintiffs' innocence, and Rhode Island

law compels a reversal of the district court's dismissal of their

claims, we leave for a later time the question of whether those

who are not innocent parties can be denied civil RICO remedies.

3. The Civil Rights Claim 3. The Civil Rights Claim

The district court also dismissed the plaintiffs' claim

that the individual defendants and the Town acted under color of

state authority and municipal practice, and deprived the

plaintiffs of property and rights in violation of 42 U.S.C. 

1983.

Section 1983 authorizes actions for equitable relief

and/or damages against "[e]very person who under color of any .

. . custom or usage, of any State or Territory . . . subjects or

causes to be subjected any citizen of the United States or other

person . . . to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws." 42 U.S.C. 

1983. Furthermore, those who commit actionable wrongs under that

section "shall be liable to the party injured in an action at

law, suit in equity, or other proper proceeding in redress." Id. 

In construing the terms "custom" and "usage," the Supreme Court

has instructed that 

Congress included customs and usages [in
section 1983] because of the persistent
and widespread discriminatory practices
of state officials . . . . Although not
authorized by written law, such practices
of state officials could well be so

-21-

permanent and well settled as to
constitute a "custom or usage" with the
force of law.

Monell v. Department of Social Servs. of New York, 436 U.S. 658, 

691 (1978) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 

167-68 (1970)); see Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st 

Cir. 1989).

Courts have set forth two requirements for maintaining

a section 1983 action grounded upon an unconstitutional municipal

custom. First, the custom or practice "must be attributable to

the municipality." Id. at 1156. That is, "it must be so well- 

settled and widespread that the policymaking officials of the

municipality can be said to have either actual or constructive

knowledge of it yet did nothing to end the practice." Id. 

Second, "the custom must have been the cause of and the moving

force behind the deprivation of constitutional rights." Id. 

The district court concluded that in the facts alleged,

"there [was] no evidence that the Town [] had any policy

endorsing or advocating extortion and the acceptance of bribes by

town officials." Roma Constr. Co., 906 F. Supp. at 83. 

Furthermore, the district court went on to state that, even

assuming "that there was a de facto municipal policy of extortion

promulgated by aRusso and perpetrated by the other named

defendants," the plaintiffs could not succeed in their section

1983 claim because the alleged policy was not the cause of any

constitutional harm. Id. Noting that there must be a "direct 

causal link" between a municipal policy or custom and the alleged

-22-

constitutional violation to find section 1983 liability, id. at 

84 (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)), 

the district court concluded that "in this case, the 'causal

link' or 'moving force' behind any perceived constitutional

violations is the plaintiffs' . . . continual, voluntary payment

of bribes to the defendants," id. 

For the reasons we have stated in our discussion

regarding bribery and coercive extortion, we think a finder of

fact could reasonably infer that the plaintiffs' payments were

made pursuant to coercive extortion, and thus did not necessarily

constitute "voluntary payment of bribes" with corrupt intent. At

this stage, we must resolve reasonable inferences in favor of the

plaintiffs. Thus, we conclude that the plaintiffs could show a

direct causal link between the defendants' coercive extortion and

the plaintiffs' losses.

As a result, we turn to the question of whether

coercive extortion, if found, could be attributed to some de 

facto municipal policy. "An unconstitutional policy or custom 

may be inferred from a single decision or act . . . [but] the

isolated action must be taken by a municipal official with 'final

policy-making authority' in the relevant area of the city's

business." Rodr quez v. Furtado, 771 F. Supp. 1245, 1257 (D. 

Mass. 1991) (citations omitted). However, "[t]he fact that a

particular official -- even a policymaking official -- has

discretion in the exercise of a particular function does not,

without more, give rise to municipal liability based on an

-23-

exercise of that discretion." Pembaur v. City of Cincinnati, 475 

U.S. 469, 481-82 (1986) (Brennan, J., plurality opinion).

In their pleadings, the plaintiffs have alleged that

aRusso as Mayor, Benjamin Zanni as a town councilman, and others

operated a de facto government which controlled the Town for more 

than a decade, routinely engaging in bribery, extortion,

corruption and other unlawful activities. While a showing that

aRusso acted illegally in the exercise of his discretion as Mayor

might not by itself give rise to municipal liability, we think

that under these pleadings, the plaintiffs could indeed prove a

set of facts from which a trier of fact could infer an

unconstitutional policy or custom with respect to the Town's

government. For example, a fact finder could conclude that

extortion of outsiders, businessmen, or developers, if proven,

was "'the way things are done and have been done'" in the Town.

See Kibbe v. City of Springfield, 777 F.2d 801, 806 (1st Cir. 

1985) (quoting Grandstaff v. City of Borger, 767 F.2d 161, 171 

(5th Cir. 1985), cert. denied, 480 U.S. 916 (1987)), cert. 

granted, 475 U.S. 1064 (1986), cert. dismissed, 480 U.S. 257 

(1987). As a result, we reverse the district court's dismissal

of the plaintiffs' section 1983 claim on the pleadings, and we

remand for further proceedings on their claim.

B. Blakey's Pro Hac Vice Admission B. Blakey's Pro Hac Vice Admission 

The plaintiffs also appeal the district court's denial

of admission pro hac vice of their attorney, G. Robert Blakey 

("Blakey"). On May 15, 1995, the plaintiffs moved for Blakey's

-24-

admission pro hac vice. The district court denied the motion on 

June 2, 1995. On June 12, 1995, the plaintiffs moved for

reconsideration of the court's order; the district court denied

the motion for reconsideration on September 25, 1995.

The district court articulated two grounds for denying

Blakey's pro hac vice admission. First, the district court noted 

that a previous motion by the plaintiffs seeking the admission

pro hac vice of another of their attorneys, Spaloss, had already 

been granted. Second, the district court expressed concern about

the amount of attorney's fees being generated by the plaintiffs.5

The Supreme Court has recognized that "in many District

Courts, the decision on whether to grant pro hac vice status to 

an out-of-state attorney is purely discretionary." Frazier v. 

Heebe, 482 U.S. 641, 651 n.13 (1987). However, the plaintiffs 

argue that the U.S. District Court for the District of Rhode

Island is not one of those courts. Local Rule 5(c) of the

District of Rhode Island provides in pertinent part that

[a]ny attorney who is a member in good
standing of the bar of the United States
Supreme Court, of any other United States
District court, or of the highest court
of any state, shall on motion be 
permitted to appear once in a calendar 
year in a case or group of related cases
in association with a member of the bar
of this court who is actively engaged in
the practice of law within the State of
Rhode Island . . . .

D.R.I. R. 5(c) (emphasis added). The plaintiffs argue that in
 

5 A successful civil RICO plaintiff may collect reasonable
attorney's fees in addition to treble damages. 18 U.S.C.
1964(c). 

-25-

contrast to the Local Rules of the other districts in this

circuit, Rhode Island's rule does not by its terms provide for

the court's discretion. Compare D.R.I. R. 5(c) ("shall on motion 

be permitted to appear") with D. Me. R. 3(d)(1) ("may at the 

discretion of the Court . . . be permitted to practice"); D.

Mass. R. 6(b) ("may appear and practice in this court in a

particular case by leave granted in the discretion of the

court"); D.N.H. R. 5(b) ("may at the discretion of the court");

D.P.R. R. 204.2 ("may be permitted"). The plaintiffs assert that

the District of Rhode Island has promulgated a rule under whose

clear language pro hac vice admission is not discretionary. As a 

result, the plaintiffs claim, the district court erred as a

matter of law in concluding that it had discretion to deny

Blakey's pro hac vice admission, or alternatively, the district 

court abused whatever discretion it had.

We do not consider the issue of whether this pro hac 

vice rule, which may be nondiscretionary, nonetheless leaves some 

discretion to deny admission. Even assuming that discretion

existed, the district court's denial of such admission to Blakey

was an abuse of that discretion. The district court's two

articulated grounds simply cannot support its action. The

district court stated that "[w]e already have one pro hac vice . 

. . [and we're] not going to take more than one on a case." We

may take judicial notice of the fact that the District of Rhode

Island has permitted multiple pro hac vice admissions in 

proceedings that were contemporaneous with the instant case. See 

-26-

Cohen v. Brown Univ., 879 F. Supp. 185 (D.R.I. 1995). 

Furthermore, regarding expense, in the instant case defendants

were represented by more than ten attorneys, the plaintiffs by

two; additionally, if the court was concerned about excessive

attorney fees, it could have addressed that matter later, if and

when the plaintiffs submitted their attorney fee application.

While it may be that Blakey has no right to pro hac 

vice admission, see Leis v. Flynt, 439 U.S. 438, 452 (1979) 

(holding that an attorney does not have a federal right to state 

court pro hac vice admission), the rights of the plaintiffs are 

another matter. Particularly here, where the plaintiffs

identified specific, logical reasons for their request,6 we

conclude that the district court's decision, based on criteria

that are not set forth in writing, that do not reasonably support

its action, and that do not appear to respond to any general

policy of the District of Rhode Island, amounts to an abuse of

discretion. 

CONCLUSION CONCLUSION

As a result of the foregoing, the judgment of the

district court is reversed. Appellants are allowed costs. reversed. 

 

6 See, e.g., Kevin Roddy, RICO in Business and Commercial 
Litigation (1993) (describing Blakey as "the acknowledged author" 
of the federal RICO statute and of "excellent" commentaries on
RICO application).

-27-

Concurrence Follows

-28-

LYNCH, Circuit Judge, concurring. At issue is whether LYNCH, Circuit Judge, concurring. 

the plaintiffs have stated a claim under Rule 12(b)(6), Fed. R.

Civ. P.7 The plaintiffs' complaint cannot be dismissed "if

relief could be granted under any set of facts that could be

proved consistent with the allegations." NOW v. Scheidler, 114 

S. Ct. 798, 803 (1994). The district court dismissed the claims

because it imported into RICO a standing requirement that the

plaintiffs must be "innocent victims." See Roma Constr. Co. v. 

aRusso, 906 F. Supp. 78, 81 (D.R.I. 1995). The review by this 

court of the dismissal is de novo. Aulson v. Blanchard, 83 F.3d 

1, 3 (1st Cir. 1996). This ruling, one of law, was, I believe,

in error. The question is, concededly, one of first impression

here. Because I analyze the matter differently than does the

majority, I write separately.

The question of who has standing to bring actions under

RICO is a matter of federal law. The pertinent provision of RICO

provides:

Any person injured in his business or
property by reason of a violation of
section 1962 of this chapter may sue
therefor in any appropriate United States
district court and shall recover
threefold the damages he sustains and the
cost of the suit, including a reasonable
attorney's fee. 

18 U.S.C. 1964(c). There is no qualification on the phrase

"any person injured in his business or property" limiting the

 

7 At oral argument, plaintiffs stipulated that their RICO claim
is not asserted against the town, but only against the individual
defendants.

-29-

phrase to "innocent" persons. RICO defines a "person" as "any

individual or entity capable of holding a legal or beneficial

interest in property." 18 U.S.C. 1961(3). On the language of

the statute, plaintiffs meet this definition.8

In general, the intent of Congress manifested in the

text of the statute governs the issue of standing:

In determining the scope of a statute, we
look first to its language. If the
statutory language is unambiguous, in the
absence of "a clearly expressed
legislative intent to the contrary, that
language must ordinarily be regarded as
conclusive."

United States v. Turkette, 452 U.S. 576, 580 (1981) (quoting 

Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 

102, 108 (1980)). The language of RICO should thus be the

primary guide to determining Congressional intent. See Sedima 

S.P.R.L. v. Imrex Co., 473 U.S. 479, 495 n.13 (1985). Indeed, 

the Supreme Court has consistently adhered to the language of

RICO in interpreting its meaning and rejected surplus

requirements not found in the statutory language. See, e.g., 

Scheidler, 114 S. Ct. at 806 (holding that RICO does not require 

an economic motive behind the racketeering activity); Reves v. 

Ernst & Young, 507 U.S. 170, 177-79 (1993) (looking to statutory 

language to determine the scope of RICO liability for "conduct"

or "participation"); Sedima, 473 U.S. at 488-92 (holding that 

private actions under RICO do not require a criminal conviction
 

8 Of course, other questions about the parameters of RICO
standing are not raised by this case, which concerns only whether
there is an "innocent victim" requirement.

-30-

on the underlying predicate offenses); Turkette, 452 U.S. at 580- 

87 (holding that the term "enterprise" as used in RICO is not

restricted to criminal enterprises); cf. Holmes v. Securities 

Investor Protection Corp., 503 U.S. 258, 265-69 (1992) 

(construing the word "injury" to require proximate cause by

reference to statutory history and judicial interpretation of

same language in Clayton Act).

Despite the lack of any "innocent victim" requirement

in the statutory language, the district court relied upon an

isolated statement in the legislative history to fashion a

requirement that only "innocent victims" be allowed to sue. The

district court's reliance on a snippet of legislative history,

lifted out of context,9 to create an absolute standing bar to
 

9 The court relies on a statement by Representative Steiger on
October 7, 1970, that "[i]t is the intent of this body, I am
certain, to see that innocent parties who are the victims of
organized crime have a right to obtain proper redress." 116
Cong. Rec. 35,346-47 (1970). That statement was made during
debate over a proposed amendment, ultimately withdrawn, which
would have authorized private injunctive relief. See Abrams, The 
Law of Civil RICO 1.4, at 30 (1991). The district court's 
characterization of the remarks as coming from "the sponsor of
the provision that eventually created a private civil remedy"
could cause a misapprehension. In fact, RICO originated in a
bill filed in the Senate, S. 30. By October 7, 1970, the
Judiciary Committee had already reported out that bill, which
included "the RICO provision ultimately enacted as section
1964(c), which created a treble damage remedy." Id. at 30. The 
debate in which Representative Steiger made the quoted remarks
was over private injunctive relief.

Further, Representative Steiger referred, in the very same
remarks relied upon by the district court, to victims of
"organized crime." Yet it was clear to both the House and the
Senate that the reach of civil RICO extended well beyond
organized crime. "Congress knew what it was doing when it
adopted commodious language capable of extending beyond organized
crime." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 

-31-

anyone not "innocent," was inappropriate. "[E]ven if we were to

read this statement to say what [defendants] say[] it means, it

would not amount to more than background noise drowned out by the

statutory language." Holmes, 503 U.S. at 269 n.15. This 

selection from the legislative history cannot overcome the plain

text of RICO, which is unambiguous. It represents "a rather thin

reed upon which to base a requirement . . . neither expressed nor

. . . fairly implied in the operative sections of [RICO]."

Scheidler, 510 U.S. at 805. Even were there occasion to consider 

the legislative history relied upon by the district court, it

says only that the statute will protect innocent victims, not

that the statute will deny standing to those who are not innocent

victims. See Turkette, 452 U.S. at 591 (noting that "negative 

inference[s]" need not be drawn from positive statements in

legislative history).

The Supreme Court has emphasized the broad reach of

RICO's language: "If the defendant engages in a pattern of

racketeering activity . . . and the racketeering activities

injure the plaintiff in his business or property, the plaintiff

 

246 (1989); see also Sedima, 473 U.S. at 499 ("Congress wanted to 
reach both 'legitimate' and 'illegitimate' enterprises. The
former enjoy neither an inherent incapacity for criminal activity
nor immunity from its consequences. The fact that 1964(c) is
used against respected businesses allegedly engaged in a pattern
of specifically identified criminal conduct is hardly a
sufficient reason for assuming that the provision is being
misconstrued." (citation omitted)); Abrams, supra, 1.1, at 5 
("RICO's name might suggest that the private cause of action
reaches primarily racketeers and other organized crime figures.
Developments since RICO's 1970 enactment, however, have laid
firmly to rest any suggestion of limited reach.").

-32-

has a claim under 1964(c). There is no room in the statutory

language for an additional . . . requirement." Sedima, 473 U.S. 

at 495. There is nothing in the language of RICO which suggests

that Congress intended to deny standing to plaintiffs who are

alleged to have committed bribery or paid extortion, whether

under coercion or not. 

Standing involves three analytically distinct

requirements: injury-in-fact, a causal connection between the

injury and the conduct complained of, and whether the wrong may

be redressed. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560- 

61 (1992). All three elements of the standing inquiry are

satisfied on the pleadings here. Plaintiffs have adequately

alleged injury-in-fact (financial loss), a causal connection

(defendants' corruptly demanding payments), and that the injury

will be redressed by a favorable decision (availability of RICO

damages). See Sedima, 473 U.S. at 496 (noting that RICO 

plaintiff has standing only if "he has been injured in his

business or property by the conduct constituting the violation");

Libertad v. Welch, 53 F.3d 428, 436 (1st Cir. 1995). This is not 

a case where the plaintiffs attempt to assert the rights of

others. Cf. Carter v. Berger, 777 F.2d 1173 (7th Cir. 1985) 

(county, not individual taxpayers, may sue under RICO for bribery

scheme resulting in underpayment of taxes). Accordingly, I would

end the standing analysis there.

In considering whether there is an "innocent victim"

standing requirement, I doubt that Congress intended for the

-33-

federal courts to refer to and incorporate state law.10 The

defendants argue that the innocent victim requirement is to be

found in the distinction, found in some state laws, between

bribery and coercive extortion. They buttress their argument by

reference to provisions of the Model Penal Code. The matter of

whether the activities in which these plaintiffs engaged fit

within the category of bribery or of coercive extortion is, in my

view, not relevant to the issue of standing.11

Although RICO references state law in its definition of

"racketeering activity,"12 it makes no substantive distinction
 

10 Caselaw holding that minority shareholders suffer no injury
to their property apart from the injury the corporation suffers
and so have no standing to sue under RICO provides no comfort to
defendants. Such caselaw does not support the principle that
reference should be made to state law to determine the contours
of any "innocent victim" defense. It is true that some decisions
refer to state law to define property interests of shareholders
as opposed to corporations to determine whether the former may
bring a RICO action. See, e.g., Leach v. FDIC, 860 F.2d 1266 
(5th Cir. 1988), cert. denied, 491 U.S. 905 (1989). Other 
caselaw, including that of this circuit, see Roeder v. Alpha 
Indus., 814 F.2d 22, 29-30 (1st Cir. 1987), refers to general 
principles of corporate law to hold that a shareholder may not
sue under RICO to vindicate a duty owed to the corporation. See 
Rand v. Anaconda Ericsson, Inc., 794 F.2d 843, 849 (2d Cir.), 
cert. denied, 479 U.S. 987 (1986); Warren v. Manufacturer's Nat'l 
Bank of Detroit, 759 F.2d 542, 545 (6th Cir. 1985); Abrams, 
supra, 3.3.6, at 147-52. In any event, the issue of whether 
state law should be referenced in defining the term "property" is
simply not present in this case.

11 If it were, then I would agree that on the facts pleaded it
is impossible to draw the conclusion that this case involves
exclusively bribery.

12 This reference to state law is in the context of RICO's
definition of predicate offenses. From this, defendants would 
infer a Congressional desire -- expressed nowhere in the statute
-- to reference state law with respect to affirmative defenses as 
well.

-34-

between "bribery" and "extortion." RICO defines "racketeering

activity" in 18 U.S.C. 1961(1)(A) to mean, inter alia, "any act 

or threat involving . . . bribery [or] extortion . . . which is

chargeable under State law and punishable by imprisonment for

more than one year." Thus, the federal statute recognizes,

without distinction, acts "involving" either bribery or extortion

as predicate offenses for purposes of RICO. Further, even in

defining such a predicate offense, state law plays a limited

role:

The labels placed on a state statute do
not determine whether that statute
proscribes bribery for purposes of the
RICO statute. Congress intended for
"bribery" to be defined generically when
it included bribery as a predicate act.
H.R. Rep. No. 1549, 91st Cong., 2d Sess.
(1970), reprinted in 1970 U.S. Code Cong. 
& Admin. News 4007, 4032 ("State offenses
are included by generic designation.").
Thus, any statute that proscribes conduct
which could be generically defined as
bribery can be the basis for a predicate
act.

United States v. Garner, 837 F.2d 1404, 1418 (7th Cir. 1987), 

cert. denied, 486 U.S. 1035 (1988); accord United States v. 

Forsythe, 560 F.2d 1127, 1137 (3d Cir. 1977). Here, the 

plaintiffs' complaint also alleges, in addition to the state law

predicate offense, a predicate federal offense, violation of 18

U.S.C. 1951 (wrongful use of official authority to obstruct,

delay, and effect commercial activity in interstate commerce).

That statute also does not draw the distinction defendants urge.

Nonetheless, standing issues aside, the question

remains whether there is some form of requirement in RICO, which

-35-

may be tested on a motion to dismiss, that plaintiffs be innocent

victims. At least two other possibilities emerge: that such a

requirement is inherent in the cause of action or that it is an

affirmative defense.

To the extent that the existence of a cause of action

is a matter analytically distinct from the issue of standing, see 

Libertad, 53 F.3d at 438 n.5, a cause of action has been stated 

here.13 There is nothing in the language of RICO which suggests

that only innocent plaintiffs have a cause of action. See 

Scheidler, 114 S. Ct. at 806 ("[T]he statutory language is 

unambiguous and [the] legislative history [evidences] no such

'clearly expressed legislative intent to the contrary' that would

warrant a different construction." (citation omitted)). Under

the proximate causation test of Holmes, 503 U.S. at 268, there is 

a cause of action stated.14 The damages alleged here on the
 

13 But cf. Sunstein, Standing and the Privatization of Public 
Law, 88. Colum. L. Rev. 1432, 1433 (1988) (arguing that "[f]or 
purposes of standing, the principal question should be whether
Congress has created a cause of action").

14 It may also be, as the district court suggested, see Roma, 
906 F. Supp. at 82 n.1, that the plaintiffs' relative culpability
may be considered in deciding, under Holmes, the issue of 
proximate causation based on the evidence presented. See, e.g., 
Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 
134, 142-47 (White, J., concurring) (treating relative
culpability, in antitrust context, as part of causation
analysis), overruled on other grounds by Copperweld Corp. v. 
Independence Tube Corp., 463 U.S. 752 (1984). The issue of 
proximate cause may not be decided at the pleading stage given
the allegations in this complaint. 

Relative culpability may also be relevant to the measure of
damages. The opinions in Perma Life posit that the benefits 
received by a plaintiff from its participation in wrongdoing "can
of course be taken into consideration in computing damages."

-36-

pleadings are neither remote nor speculative. These plaintiffs

have alleged direct injury to their property, which Holmes 

requires. Holmes, 503 U.S. at 265-69; see also id. at 276-86 

(O'Connor, J., concurring) (analyzing the causation issue as part

of the standing issue). Again, viewing this as a matter of

whether there is an "innocent victim" requirement inherent in

stating a cause of action, I do not believe state law is

pertinent.

The district court opinion also suggests that the

"innocent victim" argument may be available as an affirmative

defense. If so, there are a range of possibilities for the

contours of the defense. The range includes a sort of absolute

defense if the plaintiff has done anything wrong, which is what

the district court thought and to which it applied the label of

an in pari delicto defense.15 At the other end of the range is 

the position that the relative guilt of the plaintiff is

irrelevant. That, I believe, cannot be so,16 and even the
 

Perma Life, 392 U.S. at 140; see also II Areeda & Hovenkamp, 
Antitrust Law 365c3, at 248 (1995 rev. ed.). 

15 This common law defense derives from the Latin in pari 
delicto potior est conditio defendentis: "In a case of equal or 
mutual fault . . . the condition of the [defending] party is
the better one." Black's Law Dictionary 791 (6th ed. 1990). The 
in pari delicto defense, though "[i]n its classic formulation . . 
. narrowly limited to situations where the plaintiff truly bore
at least substantially equal responsibility for his injury . . ."
is now generally given "a broad application to bar actions where
plaintiffs simply have been involved generally in 'the same sort
of wrongdoing' as defendants." Bateman Eichler, Hill Richards, 
Inc. v. Berner, 472 U.S. 299, 306-07 (1985) (quoting Perma Life, 
392 U.S. at 138).

16 See, e.g., discussion in footnote 14 supra. 

-37-

plaintiffs do not argue that position. While some affirmative

defenses, such as the statute of limitations, may on occasion be

decided on the pleadings, the assertion of an affirmative defense

here would not afford a basis to dismiss the complaint under Rule

12(b)(6). Under any of the plausible articulations of such a

defense, the inferences to be drawn from the facts pled here do

not permit dismissal.

I would reject the proposition, urged by defendants,

that an absolute in pari delicto defense is embedded in RICO. In 

construing the language of RICO, the Supreme Court has looked to

precedent under the Clayton Act, the statute upon which RICO was

modeled. See Holmes, 503 U.S. at 268 ("We may fairly credit the 

91st Congress, which enacted RICO, with knowing the

interpretation federal courts had given the words earlier

Congresses had used first in [the Sherman Act], and later in the

Clayton Act's 4. It used the same words, and we can only

assume that it intended them to have the same meaning that courts

had already given them." (citations omitted)). The Supreme

Court, in Perma Life Mufflers, Inc. v. International Parts Corp., 

392 U.S. 134, 138-40 (1968), overruled on other grounds by 

Copperweld Corp. v. Independence Tube Corp., 463 U.S. 752 (1984), 

explicitly rejected the existence of an in pari delicto defense 

under the Clayton Act. In Pinter v. Dahl, 486 U.S. 622 (1988), 

the Court reaffirmed that in its contemporary "broadened"

construction, precisely the construction contemplated by the

district court here, the in pari delicto defense "is not 

-38-

appropriate in litigation arising under federal regulatory

statutes." Id. at 632; see Sullivan v. National Football League, 

34 F.3d 1091, 1107-09 (1st Cir. 1994), cert. denied, 115 S. Ct. 

1252 (1995). For the same reasons, an "unclean hands" defense

would seem to be unavailable, as it is not a defense to an

antitrust treble damage action. See Kiefer-Stewart Co. v. 

Seagram & Sons, 340 U.S. 211, 214 (1951), overruled on other 

grounds by Copperweld Corp. v. Independence Tube Corp., 463 U.S. 

752 (1984); see also Simpson v. Union Oil Co., 377 U.S. 13 

(1964).

That there is no in pari delicto defense does not mean 

there is no defense at all in which the relative guilt of the

plaintiffs may be weighed. It is far more likely that there is

in RICO an "equal involvement" defense similar to the "equal

involvement" defense recognized under the Clayton Act in Perma 

Life.17 Recognition of such a defense, patterned on the Clayton 
 

17 In Perma Life, five concurring Justices, in four separate 
opinions, recognized the existence of the equal involvement
defense. Justice White wrote that he "would deny recovery where
plaintiff and defendant bear substantially equal responsibility
for [the] injury resulting to one of them . . . ." 392 U.S. at
146 (White, J., concurring). According to Justice Fortas, "[i]f
the fault of the parties is reasonably within the same scale --
if the 'delictum' is approximately 'par' -- then the doctrine 
should bar recovery." 392 U.S. at 147 (Fortas, J., concurring).
Justice Marshall wrote that he "would hold that where a defendant
in a private antitrust suit can show that the plaintiff actively
participated in the formation and implementation of an illegal
scheme, and is substantially equally at fault, the plaintiff
should be barred from imposing liability on the defendant." 392
U.S. at 149 (Marshall, J., concurring). Justice Harlan, in an
opinion joined by Justice Stewart, indicated that the defense
should be allowed in cases where "the plaintiffs were
substantially as much responsible . . . as the defendants." 392
U.S. at 156 (Harlan, J., concurring in part and dissenting in

-39-

Act defense, was extended to securities actions in Bateman 

Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306-11 

(1985). The equal involvement defense is more demanding of those

asserting it than the in pari delicto defense and only bars the 

claims of a plaintiff who "truly bore at least substantially

equal responsibility [as the defendant] for the violation" of the

federal law at issue. Id. at 308. 

This circuit has also recognized an equal involvement

defense in antitrust actions. Sullivan, 34 F.3d at 1107 ("A 

plaintiff's 'complete, voluntary, and substantially equal

participation' in an illegal practice under the antitrust laws

precludes recovery for that antitrust violation." (quoting CVD, 

Inc. v. Raytheon Co., 769 F.2d 842, 856 (1st Cir. 1985), cert. 

denied, 475 U.S. 1016 (1986))). 

Testing the allegations of the complaint against the

Supreme Court's articulation of the equal involvement defense,

this complaint survives a Rule 12(b)(6) motion. Under that

defense:

a private action for damages . . . may be
barred on the grounds of the plaintiff's
own culpability only where (1) as a
direct result of his own actions, the
plaintiff bears at least substantially
equal responsibility for the violations
he seeks to redress, and (2) preclusion
of suit would not significantly interfere
with the effective enforcement of [RICO]
and the protection of the . . . public.

 

part).

-40-

Bateman, 472 U.S. at 310-11. Both the Supreme Court and this 

court have cautioned against deciding such defenses in the

absence of factual development. See id. at 311 n.21 ("We note, 

however, the inappropriateness of resolving the question of

respondents' fault solely on the basis of the allegations set

forth in the complaint."); Sullivan, 34 F.3d at 1109 ("Ultimately 

. . . these are factual questions for the jury . . . .").

The defendants make a misplaced attempt to argue in

favor of the more defendant-helpful in pari delicto defense by 

relying on Tafflin v. Levitt, 493 U.S. 455 (1990). Tafflin, they 

urge, weakens the analogy of RICO to the Clayton Act, and,

therefore, to the equal involvement defense. In Tafflin, the 

Court held that RICO did not vest exclusive jurisdiction in the

federal courts where the language of the statute did not purport

to do so and the legislative history did not show that Congress

addressed the question. Id. at 460-62. The Court rejected the 

argument that it should derive such an exclusivity from the fact

that actions under the Clayton Act may only be brought in federal

court. Id. at 462-63. The analogy to the Clayton Act did not 

provide the answer because Congress was also presumed to have

operated against a backdrop of well-established law governing

when there was exclusive federal jurisdiction. Id. at 459-60. 

There is no such "judicial default rule" which operates in

defendants' favor here. Cf. Landgraf v. U.S.I. Film Products, 

114 S. Ct. 1483, 1505 (1994) (discussing judicial default rules

in the context of retroactivity of statutes).

-41-

Similarly, there is no comfort for defendants in the

Supreme Court's rejection in Sedima of application of the 

"antitrust injury" rule to RICO. "[T]his is so because 'RICO

injury' would [otherwise] be an unintelligible requirement, not

because there is no parallel between the two statutes." Carter 

v. Berger, 777 F.2d 1173, 1176 (7th Cir. 1985) (noting the 

Court's remark in Sedima, 473 U.S. at 489-90 & n.8, that Congress 

relied on the analogy to antitrust).

Indeed, RICO was enacted in 1970, after the Perma Life 

decision, of which Congress was undoubtedly aware. The modelling

of RICO on the Clayton Act was done against the backdrop of

judicial recognition of an equal involvement defense. The piece

of legislative history relied upon by defendants, to the extent

it should be considered at all, may be equally read to support

the proposition that Congress implicitly allowed an affirmative

equal involvement defense as under the Clayton Act.

But defendants do have a point. The analogy to the

Clayton Act is not perfect. Indeed, the American Bar Association

report from which the civil RICO provisions emerged suggests that

not all the accoutrements of the Clayton Act should be imported

into RICO. See 115 Cong. Rec. 6995 (1969) (Report of A.B.A. 

Antitrust Section); Abrams, supra, 1.4, at 25-26. This may be 

a situation where Congress did not explicitly contemplate the

question and so congressional "intent" in the classic formulation

simply does not exist. The courts then are left with the

delicate task of providing the answer.

-42-

I very much doubt that the federal definition of

"innocence" for purposes of the equal involvement defense would

ordinarily involve reference to and incorporation of state law,

as the majority asserts.18 The Supreme Court did not look to

state law to define the defense in either Perma Life or Bateman, 

nor should we do so here. Nor has this court looked to state law

to define the defense under the Clayton Act in the aftermath of

Perma Life. 

To say there is some form of affirmative defense like

the equal involvement defense does not describe precisely the

content of such a defense. Even the Supreme Court Justices in

Perma Life did not agree on the content. See supra footnote 17. 

In the absence of factual findings in which to set the questions

of the honing of such a defense, there is, and should be,

reluctance to engage now in such refinement. The precision of

any standard awaits further development. It is enough now to say

that the positions at the extremities -- that any wrongdoing

disables a plaintiff or that wrongdoing is irrelevant -- are

untenable.
 

18 There may be situations, not present here, in which the state
has such an exceptionally strong policy interest in the
enforcement of its own laws that Congress would choose to
accommodate that interest in the RICO enforcement scheme. This
may be more true under RICO than other statutes in as much as
Congress has referred to violations of state law in defining
predicate offenses under 18 U.S.C. 1961(1)(A). However, the
recognition of an interest in enforcement is not the same as the
recognition of an interest in a defense. The Rhode Island
bribery and extortion statutes do not evidence such an
overwhelming interest in affording defendants an in pari delicto 
defense, even before reaching the issue of whether Congress would
have wanted to import Rhode Island law into RICO.

-43-

The equal involvement defense recognized under the

Clayton Act and the Securities Act derives its contours from

federal policy as recognized by federal statutes. There is no

reason not to apply that paradigm to RICO.19

As to the claim under 42 U.S.C. 1983, the plaintiffs

have adequately alleged that the harm they suffered was caused by

the extortionist policies and practices in which the town

officials are claimed to have engaged. Again, there is no need

to delve into the distinction between coercive extortion and

bribery.

 

19 The district court was very troubled by the notion of
rewarding people who pay bribes to public officials with RICO
treble damages, whatever the circumstances of the payment. Roma, 
906 F. Supp. at 82-83. That is certainly a reasonable concern.
Policy arguments may be made both for and against such a result.
In the antitrust field, the Supreme Court has noted that because
of the "important public purposes" served by private suits, it is
inappropriate to invoke "broad common-law barriers to relief."
Perma Life, 392 U.S. at 138. Thus "the plaintiff who reaps the 
reward of treble damages may be no less morally reprehensible
than the defendant, but the law encourages his suit to further
the overriding public policy in favor of competition." Id. at 
139.

This strong enforcement rationale certainly is present in
RICO, a statute intended to increase the arsenal of weapons
striking at criminal activity. In addition, it may be inherently
unfair to deny plaintiffs any ability to pursue a RICO claim
where their fault is relatively small. An absolute "innocent
victim" requirement would create such an undesirable imbalance.

-44-